IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

                                 Plaintiff,

       v.

JEREMIAH EDWARDS,

                                 Defendant.

REPORT AND
RECOMMENDATION

18-cr-162-jdp

_____

## REPORT

On November 28, 2018, the grand jury indicted Jeremiah Edwards and Kanasha Woods, charging each of them with the November 8, 2018 armed robbery of an O'Reilly Auto Parts store on Madison's East Side, in violation of 18 U.S.C. §§ 1951 and 924(c). Dkt. 9.[1] On March 25, 2019, Woods pled guilty to the Hobbs Act charge (dkt. 27), and on June 19, 2019, this court sentenced her to 42 months in prison (dkt. 61). Woods is cooperating against Edwards and intends to testify against him at trial.

On August 4, 2019, Edwards filed five motions to suppress evidence, listed here by docket number: **(65)** Suppress co-defendant Kanasha Woods's out-of-court identification of Edwards and prohibit her from attempting an in-court identification; **(66)** Suppress evidence uncovered by and derived from Detective Johnson's January 1, 2019 search of Edwards's impounded Mitsubishi Outlander; **(67)** Quash the warrant allowing a tracking device to be attached to the Outlander and suppress all derived evidence, due to a *Franks* violation[2] and lack of probable cause; **(68)** Quash the tracking device warrant because the device was installed

_____

[1] The grand jury subsequently returned a superseding indictment against Edwards (dkt. 77) that is irrelevant to this report and recommendation.

[2] *Franks v. Delaware*, 438 U.S. 154 (1978).

before the warrant issued; and **(69)** Suppress evidence seized during the November 9, 2018 search of the Outlander for failure to comply with F.R. Crim. Pro. 41(f)(1)(A).

For the reasons stated below, I am recommending that the court deny all of Edwards's pending motions.

## FACTS

On August 30, 2019, the court held an evidentiary hearing and a *Franks* hearing on all of these motions. Having heard and seen the witnesses testify, having watched and considered surveillance and interrogation videos, having considered the other exhibits and relevant documents in the record, and having made credibility determinations, I find the following facts:

### I. The Police Place a Tracking Device on Edwards's SUV, Then Monitor It.

In the fall of 2018, a series of eight armed robberies had been committed in Madison and adjoining communities. The evidence available to law enforcement officers suggested that the same man had committed all eight robberies and various local agencies worked together to identify and arrest the robber.

One of these robberies occurred on November 4, 2018, at Neil's Liquor, 2415 Allen Boulevard in Middleton. The Middleton Police Department (MIPD) developed evidence leading its officers to suspect that the robber had traveled to and from the robbery in a black Mitsubishi Outlander with Wisconsin License Plate 255 ZJG (the Outlander). This determination was based primarily on video recordings generated by surveillance cameras mounted on the exterior of the Harbor Athletic Club (HAC), located at the north end of the small shopping/parking

complex in which Neil's Liquor was located.[3]  MIPD Detective David Schultz watched these videos and gathered additional evidence from other MIPD officers.

Detective Schultz submitted a sworn affidavit in support of a an application to the Dane County Circuit Court for authorization to install and monitor a GPS tracking device on the Outlander.  Det. Schultz's affidavit (Gov. Exh. 21) speaks for itself; this synopsis (which cites the handwritten paragraph numbers added to Exh. 21) flags the statements most relevant to Edwards's *Franks* challenge:

> 4.  An employee of Neil's Liquor called 911 at 7:29 p.m. on November 4, 2018 to report that he had just been robbed at gunpoint and the suspect ran out the back door.

> 13.  Det. Schultz reviewed HAC's video from the camera directed at its rear parking lot.  Behind the parking lot (to its east) is Middleton Beach Road, a dead-end road that runs north-south behind (east of) the rear parking lot that serves Neil's Liquor and HAC.  A water-filed drainage ditch runs between this parking lot and Middleton Beach Road.  A wooden footbridge spans the ditch to connect Middleton Beach Road to the parking lot.  The footbridge and Middleton Beach Road both can be seen on the HAC video.  At 7:18 p.m., a vehicle is seen driving northbound on Middleton Beach Road, then out of view; at 7:19 the vehicle is seen heading back southbound.  The vehicle parks within view of the camera and turns off its headlights.[4]

> 14.  the HAC video shows that at 7:21 p.m., the suspect walks past the rear of his vehicle northbound on Middleton Beach Road.  He is not visible for a brief period but is seen as he exits the footbridge into HAC's rear parking lot.  The suspect's clothing matches what the robber wore as captured on the video from inside Neil's Liquor.  The suspect walks south along the back of HAC's parking lot then slants to the southwest toward Neil's Liquor, out of sight at 7:23 p.m.

> 15.  At about 7:25, the suspect comes back into view, running northeast away from the direction of Neil's Liquor, then north along the back of HAC's parking

---

[3]  These videos are in the court record on the thumb drive entered as Gov. Exh. 22.  I have watched these videos twice in addition to the in-court presentation during the August 30, 2019 evidentiary hearing.  Gov. Exh. 23 is an aerial photograph of the geographically relevant area.

[4]  The sun had set hours earlier.  It's dark out.

lot and onto the footbridge.  He is lost in the dark.  Two minutes later, at 7:27, a small moving light appears on the footbridge that appears to be a cell phone. The light moves around in a fashion as if being used as a flashlight to search for something in the dark.  At 7:28 the suspect is briefly visible running north on Middleton Beach Road.

17. In response to the robbery call, MiPD officers canvassed Middleton Beach Road.  The vehicle seen on the HAC video still was parked there and the officers noted its identifying information.[5]

16.   At 9:19 p.m. on November 4, 2018, HAC's front parking lot camera shows a white SUV driving in and parking.  A man and a woman with a dog exit and walk onto the footbridge.  They appear to use lighting sources in a sweeping fashion as if searching for something.  At about 9:26 p.m., the lights flash on the suspect vehicle parked on Middleton Beach Road.  The man enters the vehicle and it drives south without turning on its headlights.  The woman and dog return to the white SUV and drive off at about 9:28.

18-20.   The car parked on Middleton Beach Road was the Outlander.   Its registered owner reported that she sold it in 2016 to her ex-boyfriend, Jeremiah Edwards.  Edwards has a lengthy criminal history including but not limited to arrests for Robbery on 6/12/1998, Armed Robbery 03/31/2000, Armed Robbery 9/24/2003, Armed Robbery 01/09/2005, Armed Robbery 9/12/2005.[6]

Dane County Circuit Judge Frank Remington granted the warrant request and on November 7, 2018, a GPS tracking device was surreptitiously installed on the Outlander.

At the August 30, 2019 evidentiary hearing, the government played the HAC parking lot surveillance videos that Det. Schultz had relied on when seeking the tracking warrant.  During direct and cross-examination, Det. Schultz explained what he saw on these videos and why he had characterized what he saw on the videos as he had in his affidavit.  Det. Schultz's statements

---

[5]   The officers photographed the vehicle about 20-30 minutes after arriving on the scene, *see* transcript, dkt. 88 at 112-13 and Gov. Exh. 24.

[6]  At the time he applied for the warrant, Det. Schultz knew that Edwards' criminal record included five felony convictions and 15 arrests, but he only listed five arrests.  *See* transcript, dkt. 88 at 125.

in his warrant affidavit accurately describe what can be seen on the videos.  Det. Schultz did not mischaracterize the content of the videos.

To the extent that there could be any legitimate quarrel with Det. Schultz's characterizations of what the videos show, Det. Schultz did not intend to mischaracterize anything.  He presented the facts in his application guilelessly. [7]

After the Outlander had been identified as the target vehicle but before the tracker had been placed on it, officers from the Madison Police Department (MPD) tailed it as it drove through town.  On November 7, 2018, they made a positive identification of Jeremiah Edwards driving the Outlander to the Moorish Science Temple in downtown Madison.  Edwards parked, entered and exited the Temple, then drove off in the Outlander.  Later that same night, the tracker was installed on the Outlander and it began sending data to a law enforcement computer that plotted the Outlander's movement  on a street map.  Officers monitored the Outlander on an MPD computer in real time as the SUV traveled through the area the following day, Thursday, November 8, 2018.  No police officer ever saw who was driving the Outlander on November 8, 2018.

The tracking device on the Outlander–which officers still were monitoring in real time on their computer–reported that from about 5:50 p.m. to 5:59 p.m. on November 8, 2018, the Outlander was near a Walmart store where Stoughton Road crossed Highway 30.  The Outlander headed south, then back north, essentially driving in large and small circles up and down Stoughton Road near Buckeye Road from 6:03 p.m. to 6:19 p.m..  Around then, the Outlander became stationary on Camden Road near Buckeye Road, close to the O'Reilly Auto

---

[7]  These are my findings of fact, having heard and seen Det. Schultz testify.

Parts store (O'Reilly's).  *See* Gov. Exhs. 3-1 and 3-2.  The officers monitoring the tracking device on the MPD computer became concerned that the Outlander was circling in a business park, so officers were dispatched to the area to initiate covert surveillance.

At about 6:52 p.m. on November 8, 2018, MPD received a report of an armed robbery at O'Reilly's.  The tracker on the Outlander showed that at 6:50 p.m. it was driving west on Buckeye Road, toward downtown Madison.  MPD officers assumed that the robbers were in the Outlander, but they did not attempt to stop it, instead choosing to follow it covertly until they saw an opportunity to perform the felony stop more safely.  Unmarked police vehicles followed the Outlander past the Capitol Square and down West Gilman Street until it pulled into a parking lot that the police believed had only one entrance.  They were wrong.  When the police made their presence known by initiating their stop, the Outlander sped out the back exit.  A high speed chase through downtown Madison ensued.

Police chased the Outlander down South Bedford but lost it near North Shore Drive on Monona Bay.  The police fanned out and came across the Outlander a few blocks away, crashed and empty.  Directed by pedestrians in the vicinity, MPD officers caught up to Kanasha Woods, whom passers-by had seen exit the Outlander.  Woods was taken to custody and transported to the county's public safety building a few blocks away.  The police did not see Edwards that night.

On November 9, 2018, MIPD Detective Schultz returned this tracking warrant to the county court.  On the sworn return, Det. Schultz mistakenly wrote that the GPS tracking device had been installed on "10/07/2018 @ 23:49."  Dkt. 68-1.  This was a scrivener's error by Det.

Schultz: the tracking device actually had been installed on 11/07/2018 and that is what Det. Schultz had intended to write.

## II. Kanasha Woods

### A. Some Background Information about Woods

Kanasha Woods was born in Milwaukee in 1994 and has lived there most of her life. Woods has been diagnosed with and treated for several mental health conditions. In November 2018, she had current prescriptions for psychotropic drugs. Prior to the instant case, Woods had one arrest as an adult (at age 17 for disorderly conduct and resisting), but the charges were dismissed without prosecution. Woods is a regular user of marijuana. At the times relevant to this case, Woods had a license for, possessed, and carried a handgun. Woods reports having been employed in security in several different settings and views herself as familiar and comfortable with firearms. She has purchased two firearms for personal use, and did her research before buying either. Woods is an adherent of the Moorish Science Temple.

Following her indictment in the instant case, Woods pled guilty to the Hobbs Act charge and the government dropped the § 924(c) charge. On June 26, 2019, the court sentenced Woods to 42 months' imprisonment. Woods is cooperating with the government by testifying against co-defendant Edwards.

### B. The November 8, 2018 Robbery

In September or October of 2018, Woods began attending classes and services at the Moorish Science Temple in Madison. She came in from Milwaukee twice each week, on Fridays

for services and Sundays for "Bible study." Services were about 90 minutes long, Bible study classes were 60 to 90 minutes long. The Grand Sheik of the Temple, whom she knew by his first name Caliph, would pick up Woods in Milwaukee and drive her to classes and services in Madison. At some point, Caliph asked Woods to provide security for events at the Temple in Madison; as a result, Woods held herself to a standard of heightened vigilance around Caliph. One of the men she noticed during her visits to Madison was Jeremiah Edwards, whom she knew as "Moe."[8] Woods specifically recalls seeing Edwards at the Temple on Sunday, November 4, 2018 because Edwards was talking to Caliph. (Woods did not know that Edwards and Caliph were brothers until after her arrest).

Although November 8, 2018 was a Thursday, Caliph told Woods that there was going to be a small gathering at the Temple in Madison and he asked her to accompany him. Woods agreed and Caliph drove with her to Madison. They arrived around 4:00 and attended a small service at the Temple. Only two or three other people were there; Edwards was one of them.

---

[8] Edwards's identification suppression motion (dkt. 65) is based on his contention that Woods is mistaken, lying, or both. Having heard and seen Woods testify on August 30, 2019, and having considered the other relevant evidence admitted into the record, I conclude that Woods correctly identified Edwards to MPD as the other robber and she now is telling the truth about what happened. More on this in the analysis. Even if there were to be a legal basis to suppress Woods's identification of Edwards–and I conclude below that there is not–I still would find, from the evidence currently in the record that is appropriate for me to review, that "Moe" is defendant Jeremiah Edwards. Therefore, I will refer to him as Edwards in finding facts, even though Woods did not know his name at the time. To the same effect, although Woods did not know the make of the vehicle in which they were traveling, the evidence establishes that it was the Outlander on which the police had put the tracking device, so that's how I will refer to it.

On September 16, 2019, Edwards filed his notice of alibi, contending that he was somewhere else during the robbery of O'Reilly's. *See* dkt. 91. Edwards did not present his alibi evidence in support of his suppression motions. It will be up to the jury to consider all of the evidence admitted at trial to determine whether the government has met its burden of proving that Edwards robbed the O'Reilly's store. For the purposes of deciding Edwards's pretrial motions, having heard and seen all the evidence, I find that it was Edwards in the Outlander with Woods that night, that Edwards committed the armed robbery with Woods and that it was Edwards who abandoned the Outlander after crashing it at the end of the car chase.

The Thursday service lasted 30 to 45 minutes.  After it was over, Edwards and Caliph went into the Temple Office to talk for a while.  Woods waited in the sitting area because she needed a ride back to Milwaukee.  When Caliph and Edwards came out, Caliph told Woods he had an emergency to attend to up in Portage, so Edwards would give Woods a ride home.

Woods got into Edwards's Outlander and as they drove, they started smoking marijuana and talking about drugs.  Edwards turned on the vehicle's interior light while he retrieved his marijuana.  Edwards told Woods that he sold marijuana in different strengths and styles, including vape pens, edibles and dabs.  He showed her the vapes, in small containers inside a baggie, as well as an aroma-sealed bag containing his marijuana.  Woods gave Edwards her phone number so that she could buy marijuana from him in the future.  Edwards gave Woods some marijuana that she rolled into a blunt for the two of them to smoke.

Woods was starting to roll a second blunt when Edwards pulled a gun on her.  Based on her familiarity with handguns, Woods described it as a black 9 mm. With a small scope on top.[9] Edwards told Woods that he needed her to help him with a robbery.  He explained that he had done this more than sixty times and that everything would be okay.  Edwards told Woods that she could either get hurt or make some money.  Woods responded that she wasn't going to do it; Edwards replied that she had no choice.

By then they had driven over near the O'Reilly's store. After some cruising around, Edwards drove to the neighborhood Walmart.  Edwards gave Woods $20 and told her to  buy

---

[9]  At the evidentiary hearing, Woods identified the photographs marked and admitted as Gov. Exhs. 17 and 18 as the firearm and the scope.  The scope is attached to the bottom of the barrel in front of the trigger guard.  Although Edwards did not object to the admission of these photographs, he has moved to suppress the firearm and scope, *see* dkt. 66.  I address that motion later in this report and recommendation.

gloves and something dark to put over her face. Woods went in alone, carrying her cell phone. She did not attempt to call 911 and she did not tell anyone in the store that she was being coerced into performing a robbery. While Woods was in the store, Edwards called her; Woods did not answer the call. Woods asked two employees if there was a back way out of the store; they said no. Woods realized she would have to exit the way she had entered, so she bought a black ski mask and gloves, exited the Walmart and got back into Edwards's Outlander.

Edwards already had covered his face, with a silk face mask and a black cap adorned with a five-pointed star.[10] Edwards returned to the O'Reilly's store and drove around it until the parking lot was clear. Then they parked on a side street behind the O'Reilly's, where they sat and waited a bit. Edwards retrieved a second handgun from the center console and handed it to Woods. Woods already had her own 9 mm. handgun in her purse, but Edwards didn't know this and she didn't tell him. Woods donned her mask and gloves and the pair skulked their way to the O'Reilly's where they burst through the front doors.

Edwards, brandishing his handgun, ordered the worker up front to take him back to the safe. A second employee wandered in, so Edwards directed Woods to put him on the ground, which she did, holding him at gunpoint. A third employee was in back, apparently the manager. Edwards ordered him to open the safe. He did. Edwards took the cash, and the two robbers exited out the back, and ran to the Outlander. Edwards got there first and went straight to the driver's door. Woods did not see what he had done with his handgun, but he didn't have it in

---

[10] Woods identified the fifth photograph in Gov. Exh. 15 as a picture of Edwards's hat. The hat is included in Edward's suppression motion docketed as 66.

his hands when she got into the Outlander.  Woods returned the second handgun to Edwards and removed her mask and gloves.

Edwards drove them back downtown, where they stopped in the Temple's parking lot. A police car pulled in behind the Outlander and activated its siren.  Edwards immediately sped away down the alley and onto the street, running a red light, jumping the curb and forcing others to get out of his way.  During this escape, Edwards threw out the handgun he had provided to Woods.  Woods, who was not wearing her seatbelt, pivoted to her left to confront Edwards, yelling at him to stop.  He didn't.  Not until he hit a signpost off of Proudfit Street, immobilizing the Outlander.  Edwards and Woods jumped out of the crashed Outlander and fled.  Directed by pedestrians in the area, MPD Officers caught up to Woods and confronted her.  Edwards was never seen by the officers that evening.  The Outlander was towed to MPD's Vehicle Impound Facility where an officer sealed all its openings with evidence tape.

### C. Woods's Post-Arrest Interrogation and Subsequent Cooperation

MPD officers brought Woods to the downtown station and placed her in an interview room in which two video recorders were running. The videos are in evidence (Gov. Exh. 7) and they speak for themselves.  Both Woods and Detective Caleb Johnson testified about the interview at the evidentiary hearing, thereby amplifying what the video shows.

After Woods was escorted into the interview room, an MPD officer and staffer provided her with a blanket, a bottle of water and asked for her telephone number.  Although Woods had smoked a blunt with Edwards earlier that evening, she was in control of her senses and felt like she knew what she was doing. As the officer waited with Woods for a detective to arrive, Woods

11

volunteered some information about her handgun being in her pink purse in the back of "Moe's" car. Woods claimed not to know who Moe was. Woods and the officer chit-chatted for about 10 or 12 minutes until the officer swapped out with another officer who was toting SWAT gear and a long gun in a case.

This was one of the officers who had transported Woods to the station, and during the ride, Woods made some statements that apparently were self-exculpatory. In the interview room, this officer confronted Woods with his opinion that she was lying. The officer stridently told Woods that he knew that she was in the car that crashed; Woods responded by playing dumb. The Officer repeated that if Woods told the truth to the detective who would be coming in, then she will be fine. He informed Woods that the police were doing things to follow the Outlander that Woods did not know about; if she lied to them, then she will go to jail. The officer stalked out and was replaced by the first officer, who professed ignorance to Woods about what was happening with the investigation.

Not quite 30 minutes after Woods had been brought into the room, MPD Detective Caleb Johnson entered carrying an unzipped leather binder full of documents. Det. Johnson has been an officer with MPD since 2007; in November 2018 he was a detective in MPD's Violent Crime Unit. After some chitchat, Woods told Det. Johnson that she had a problem with the way the confrontational officer had approached her, and she thought he was too aggressive. Det. Johnson apologized to Woods and told her that she was not under arrest, they didn't have any information that she was involved, that he didn't see her being charged with anything and he had no intention of charging her with anything. The police just wanted to find out if she knew

anything.  Det. Johnson then read Woods her *Miranda* rights off of a wallet card.  Woods asked about her phone, which became one of her themes during her interrogation.

Det. Johnson asked Woods to tell him what happened that day and who she was with. She explained that she was with "Moe," but she didn't know his real name because *all* of the men at the Temple were called "Moe."  Woods narrated a meandering version of the evening's events that involved a group of men (including Edwards) traveling with her and Caliph to a barbecue restaurant, then to services, after which Caliph began driving her back to Milwaukee. Caliph stopped the car to let Woods buy cigarettes, but after she got out she got disoriented; next thing she knew, the police were approaching her.  This story was a fabrication.  Based on what he already knew, Det. Johnson was pretty sure that Woods was lying to him.

Det. Johnson announced that he would check on whether anyone had located Woods's phone or inhaler, and to gather snacks and drinks for both of them.  Det. Johnson apparently also took this opportunity to consult with fellow officers, who were watching the video of Woods's interview in another room.  When Det. Johnson returned, he divided the snacks and gave Woods an update on her phone, which no one had located yet.

During this chat with Woods, Det. Johnson opened his leather binder by its  edge.  He looked down and saw that it had opened to a blank piece of paper with a pen on top.  Det. Johnson promptly shut the binder.  While continuing to talk, Det Johnson flipped over the binder and turned it around.  While making eye contact with Woods and continuing to talk to her, Det. Johnson reopened his binder by the edge that he had maneuvered to be on top.  Visible was a booking photo of Jeremiah Edwards, facing toward Det. Johnson, upside down to Woods. Det. Johnson did not look down to see what was showing.  Without breaking eye contact with

13

Woods, Johnson nudged the binder from his left to front and center.  He left the folder open for a three-count, then shut it again.  Det. Johnson never looked down at the photo while it was visible to Woods.  Instead, he kept his eyes on her face the entire time.  This was not an attempt by Det. Johnson to prompt Woods to identify Edwards as her accomplice, it was an interrogation tactic meant to apprise Woods of what the police already knew.  Neither Det. Johnson nor Woods referred to the photo in any fashion at that time.

Woods saw the photograph. Even upside down, she immediately recognized that the picture was a photograph of the person with whom she actually had committed the robbery. This recognition was not prompted or influenced by the manner in which the photograph had been exposed.  In other words, it was reliable.  Upon seeing this photograph, Woods realized that the police already knew what actually had happened that night.  But at that time, Woods said nothing about having recognizing Edwards, nor did she verbalize her epiphany about the investigation.

The interview continued for about 45 more minutes, with Det. Johnson advising Woods that the police had been watching "Moe" (whom they knew to be Edwards) all day and would be able to compare Woods's story to what they already knew to determine whether Woods was lying.  About an hour and 38 minutes into the interview, Det. Johnson asked Woods, "do you think we'd rather have Moe or we'd rather have you?"  Woods responded "that picture you have—I saw it in your thingie. That's him."  Woods volunteered this response because it was true, not because she was trying to tell the police what she thought they wanted to hear.

Det. Johnson waved her off, responding that he wanted to talk to Woods about the photograph eventually, but right now he wanted to continue discussing with Woods the

consequences that she faced.  As the interrogation continued, Woods changed her story.  She admitted that she had been with "Moe" when he had robbed the O'Reilly's store and she gave a more accurate version of what had transpired that evening.

About 2½ hours after Woods had been brought into the interview room, Det. Johnson returned to the topic of identifying "Moe."  Det. Johnson confirmed how many times Woods had seen Moe:  once before, at Sunday school for about 45 minutes, then before and during the robbery.  Det. Johnson asked Woods if she would be able to pick "Moe" out of a crowd if she saw him again.  Woods indicated that she could.  Det. Johnson asked whether there was any way she could confuse Moe with somebody else.  Woods indicated that she would not.  Woods explained how and why she had paid special attention to "Moe" at the Temple service, and then, he had put a gun in her face.  Woods confirmed to Det. Johnson that if she saw a picture, she would have no doubt saying either that it was "Moe" or that it wasn't.  She described Moe as bald, black, medium build, like he worked out but still had a belly, early 30s.

A bit later, Det. Johnson excused himself, returned two minutes later and showed Woods a photograph of a hoodie.  Woods identified it as her hoodie, which she had worn during the robbery.  She reported that after they crashed the Outlander, Moe had directed her to throw it away.  Next Det. Johnson pulled out a single booking photograph of a man and presented it to Johnson, right-side up.  Woods immediately identified this man as Caliph.  Det. Johnson presented Woods with the booking photo of Edwards.  In the photograph, Edwards had hair. (*See* Gov. Exh. 1).  Woods immediately said "that's Moe."  Det. Johnson asked "the Moe that did the robbery?"  Woods contemplated the picture for a second, then put her hands on  it to cover the hair.  She said, "Yeah.  He's bald now."  Det. Johnson returned the two booking

15

photos to his binder.   At the conclusion of the interview, Woods was formally arrested and taken into custody.

It had been a group decision at MPD to show Woods a single photograph of Edwards rather than employ a photospread or some other multi-photo technique.   MPD's policy is to use photospreads when the eyewitness has no previous familiarity with the perpetrator.   Otherwise, explained Det. Johnson,

> The other way we sometimes use photographs to identify a suspect is by simply showing a single photograph when a witness or a victim knows a suspect, has some personal familiarity with them, but does not know the name that would appear on a driver's license, for instance.   The question really at that point is not do you know who this person is; it's are we talking about the same person.   And so in instances like that where there is a foundation established, yes, the victim or the witness knows the suspect, they just don't know what their true, you know, government-issued identification card would display as their name, then we would show a single photograph.

> Transcript, dkt. 88 at 31.

At the August 30, 2019 evidentiary hearing, Woods confirmed this identification as accurate and denied any motive to tell the police what she thought they wanted to hear, and denied any motive to frame Jeremiah Edwards.

### III. The Outlander Is Searched

At 1:16 p.m. on November 9, 2018, MPD Detective Justine Harris applied to the Dane County Circuit Court for a warrant to search the Outlander.   Judge Bailey-Rihn issued the warrant, which commended the police "forthwith" to search the vehicle and to return the warrant within 48 hours of the search.   *See* dkt. 69-2. The vehicle was searched that same

afternoon. Items seized included a loaded 9mm handgun, $2,439 in loose cash, a Walmart receipt, gloves, a ski mask, three cell phones (one identified as belonging to Woods), and a battery charger and cord found "in Wood's purse." *See* Gov. Exh. 12. Also seized were narcotics, binoculars, documents and a sword. *See* dkt. 66-3. The warrant return by Det. Harris was dated November 12, 2018 but it did not report the date or time that the officers actually had executed the warrant. (This court knows the date the warrant was executed based on Det. Johnson's testimony at the evidentiary hearing, *see* Transcript, dkt. 88 at 37-38).[11]

Because the O'Reilly's store was located in the Town of Blooming Grove, the Dane County Sheriff's Department took possession of some of the evidence, and MPD took the rest. The police left a fair amount of random stuff strewn inside the Outlander, *see, e.g.,* Gov. Exh. 15, 2nd photo. Apparently, MPD never performed an inventory search of the Outlander.

On November 28, 2018, the federal grand jury indicted Woods and Edwards, charging both with violating 18 U.S.C. § 1951 and 18 U.S.C. §924(c). Woods remained detained at the Dane County Jail. Edwards was not found until March 11, 2019, when he was arrested in Chicago on local charges involving guns, drugs and armed violence. *See* Pretrial Services Report, dkt. 31 (sealed) at 4.

In December 2018, Woods's attorney asked the government to return her purse, debit card and cash so that Woods could put more money in her jail account. The Assistant U.S. Attorney agreed, but neither the Sheriff's Office nor MPD could account for Woods's purse in their inventories of seized property. The consensus was that the purse must still be in the

---

[11] These facts are relevant to Edwards's motion to quash the search based on an alleged failure to return the warrant properly.

Outlander amidst the unseized detritus.  Det. Johnson was directed to go look for Woods's purse inside the Outlander; apparently this direction came from his superiors.

On January 1, 2019, Det. Johnson entered the impound facility and approached the sealed Outlander.  Peering through the front passenger window, he thought he saw a zippered wallet on the seat.  He broke the evidence tape and opened the door.  The item was a sunglasses case.  He glanced over the other personal belongings, drug paraphernalia and food scattered in the front passenger area but did not see a purse or wallet.  Det. Johnson looked into the back seat; he saw a pink flowered purse on the floor in front of the rear seat on the driver's side.  Not wishing to break more evidence seals, and trying to avoid the garbage around him, Det. Johnson put his knees on the front passenger seat, then contorted himself over the seats and center console to reach for the purse on the floor behind the driver's seat.  While so elevated, Det. Johnson's head or shoulder bumped the ceiling, dislodging the sunglasses storage fixture, which fell out and clattered onto the car seat.  Det. Johnson picked it up and attempted to push it back into place.  (*See, e.g.,* Gov. Exh. 15, photos 3 & 4).  While looking up into the vacant slot to see where the fixture's metal retention slots would fit, Det. Johnson saw the distinctive white-dot front sight post and slide of a Glock handgun, which he recognized immediately.  Det. Johnson promptly exited the Outlander without touching or moving anything else.

Det. Johnson contacted AUSA Corey Stephan, who advised him to reseal the Outlander, write a report, and seek a search warrant.  On February 21, 2019, FBI Special Agent Beth Boxwell sought and obtained from this court a warrant to search the Outlander again.  This court issued the warrant.  Agents recovered a knit cap and a Glock handgun from the gap

between the Outlander's headliner and roof. *See* Gov. Exh. 15, Photos 5 & 6. Subsequent testing determined that Edwards's DNA was on the Glock.

ANALYSIS

I will address Edwards's motions in the order that the facts underlying them arose:

## I. Motion To Quash the Tracking Device Warrant  (dkt. 67)

Edwards moves to quash the warrant authorizing placement of a tracking device on the Outlander, contending that the warrant application was facially lacking in probable cause, that Det. Schultz knowingly and in bad faith misrepresented material facts and withheld information that could have negated probable cause. Dkt. 67. The government acceded to Edwards's request for a *Franks* hearing. At that hearing I saw and heard Det. Schultz explain what he saw in the surveillance videos and why he reported his observations the way he did in his search warrant application. I compared this testimony to the actual videos, which I have watched three times, including (in relevant part) during Det. Schultz's testimony. Early in this report I found as fact that:

> Det. Schultz's statements in his warrant affidavit accurately describe what can be seen on the videos. Det. Schultz did not mischaracterize the content of the videos. To the extent that there could be any legitimate quarrel with Det. Schultz's characterizations of what the videos show, Det. Schultz did not intend to mischaracterize anything. He presented the facts in his application guilelessly.

> *Supra* at 4-5.

This essentially ends the analysis, but we have to get there from here.

19

Under the standard of *Franks v. Delaware,* in order to suppress evidence obtained from the tracking device on his Outlander, Edwards must prove by a preponderance of the evidence that: (1) Det. Schultz's affidavit contained material false statement or omissions; (2) these false statements or omissions were made with deliberate or reckless disregard for the truth; and (3) these false statements or omissions were necessary to a finding of probable cause. *United States v. Gregory*, 795 F.3d 735, 743 (7th Cir. 2015); *see also United States v. Hansmeier*, 867 F3d. 807, 813 (7th Cir. 2019). As for the second element, Edwards must prove either that Det. Schultz knowingly made a false statement, or that he made a statement about whose truth he in fact entertained serious doubts, and which turned out to be untrue. *United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008). "It follows that negligence does not constitute reckless disregard for the truth." *Id.*

In his post-hearing brief, Edwards points to five statements in Det. Schultz's affidavit relating to the surveillance videos that Edwards characterizes as "assumptions being asserted as facts." Dkt. 99 at 2-3.

In Edwards's challenge #1, he claims that the video does not show anyone walking past the car parked on Middleton Beach Road. Actually, it does; at the *Franks* hearing, Det. Schultz explained what he saw on the video, and put into evidence a close-up derived from the video that showed the suspect walking and then appearing on the footbridge. Transcript, dkt. 88, at 122-23. So, Edwards's challenge is factually inaccurate. The video shows what he claims it does not.

In his challenge #2, Edwards concedes that "a figure does in fact emerge from the shadows, but it is pure speculation as to where he is coming from. There is no bridge visible." Dit. 99 at 4. But the aerial photograph of the area shows that there is nowhere else whence a

person could enter the HAC parking lot at this point except by taking the footbridge over the drainage ditch.  This isn't speculation by Det. Schultz, it is logical, supportable inference based on his knowledge of the area.  It is entirely consistent with what the video shows.

In his challenge #3, Edwards contends that it was intentionally false for Det. Schultz to state that "the suspect entered the walking footbridge heading east back toward Middleton Beach Road.  The bridge is dark and the suspect is not visible at this time."  Why is this false?  Because "there is no footbridge apparent and there is also no telling where the individual goes once he enters the darkness."  *Id.*   As just noted, there is a drainage ditch back there and it's dark out: there is nowhere else for someone to go *except* to the footbridge.  Just because Edwards cannot see the footbridge in the video doesn't mean it's not there; it didn't disappear when the sun went down.  Additionally, the next paragraph that Edwards challenges provides helpful context:

In #4, Edwards challenges Det. Schultz's report that the small moving light that appears on the walking bridge appears to be a cell phone and appears to be used as a flashlight to search for something.  What is Edwards's challenge?  "There is nothing to suggest that the  light that is briefly seen is being used as a flashlight or being used to search for something."  *Id.*  To the same effect, in his challenge #5, Edwards disputes Det. Schultz's statement that the silhouette of a man seen running north on Middleton Beach Road one minute later is the same man who ran into the dark toward the bridge three minutes earlier.

First, Edwards is just plain wrong: this is exactly what it looks like. For Edwards to contend otherwise–to the point of characterizing these as an intentional or reckless misstatement by Det. Schultz–bespeaks a subjective interpretation of the video that contradicts common

21

sense.  It's after dark in mid-November and we are looking at a parking lot that backs onto a drainage ditch that parallels a dead-end road with no lighting.  There is nobody else back there. Every one of Det. Schultz's challenged observations is an objectively reasonable inference.  He made no misstatements.  He did not mislead the issuing judge about what the surveillance videos showed.

Second and more critically, Edwards is treating each challenged statement in Det. Schultz's affidavit as if it is a stand-alone, real-time narration of events as they were unfolding. It's not.  When writing his search warrant affidavit, Det. Schultz had the benefit of watching all of the videos, getting reports from his officers, and *then* drawing logical, supportable inferences about what the video showed.   Case in point: *after* this challenged "searching-the-bridge" paragraph, Det. Shultz reports that: MIPD officers came across Edwards's Outlander parked on Middleton Beach Road; then the white SUV pulled into the HAC parking lot; a man and a woman (and a dog) went back to the bridge and searched it with lights; the man got into the Outlander and drove it off without turning on the headlights; the woman and dog returned to the SUV.  Put simply, all of the assertions in Det. Schultz's affidavit mutually reinforce each other. Edwards's individual attacks on five statements in the six most relevant paragraphs do not show that any of these statements are incorrect, let alone that they are intentional misstatements.[12]

---

[12] Here is another example of the *legerdemain* pervading Edwards's factual challenges to Det. Schultz's warrant application: after the tracking warrant was issued, Det. Schultz interviewed Connie Burrell, the woman who drove the white SUV to HAC.  Burrell told Det. Schultz that she got an urgent text from Jeremiah Edwards that night.  At Edwards's request, she drove him to HAC where the two of them walked to the footbridge to look for Edwards's lost car keys.  He found them and drove away in his truck.  (Transcript, dkt. 88, at 118-119).  I granted Edwards's request not to rely on this information when ruling on his challenges to the search warrant, *see id.*, and I have kept that promise.  But at the time he requested a *Franks* hearing, Edwards knew that it was *not* false for Det. Schultz to have stated that the light

Edwards is employing a variation of the "divide and conquer approach" in his attempt to chip away at Det. Schultz's affidavit. This approach "misses the point because the decision is based on the totality of circumstances." *United States v. Caldwell,* 423 F.3d 754, 760 (7th Cir. 2005). When using the totality-of-circumstances approach, the court does not view any particular fact in a vacuum but instead reviews all of the evidence, taken together, in the context of the case at hand. *United States v. Sewell*, 780 F.3d 839, 846 (7th Cir. 2015). The evidence must be weighed "as understood by those versed in the field of law enforcement." *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016).

Finally, Edwards claims that it was a "material misrepresentation" for Det. Schultz to state that Edwards had an extensive criminal history but then to list nothing but arrests, which are not actual convictions. Det. Schultz accurately labeled the arrests as arrests, so there was no misstatement of Edwards's criminal record, which actually lists 15 arrests and five felony convictions. As Det. Schultz observed at the *Franks* hearing, "if anything, I felt I understated it." Apparently, Edwards is arguing that Judge Remington doesn't know the difference between an arrest and a conviction, so the judge must have been tricked into issuing the tracking device warrant based on his mistaken belief that Edwards was a repeat felon. I do not share Edwards's dim view of Judge Remington's ability to comprehend this distinction. This challenge to the warrant is dead on arrival.

---

on the footbridge at 7:27 p.m. was moving around in a fashion as if being used as flashlight to search for something in the dark. Edwards knew this statement was accurate because that's exactly what he had been doing. Nonetheless, Edwards argues that this court should conclude that this was a recklessly false statement by Det. Schultz because at the time of his warrant application, Det. Schultz had no direct evidence to corroborate his conclusion about what the circumstantial evidence established.

In sum, there were no *Franks* violations. The tracking device warrant application stands as written.

In his motion to quash, Edwards also claimed that there was no probable cause to issue the tracking device warrant, but he did not develop this argument in his briefs. *Compare* dkt. 67 to dkts. 99 and 112. There's a lot of that going on here (there are more examples in both directions below), so perhaps the court could find waiver or forfeiture at this point, *see, e.g.,* *United States v. Hopper*, 934 F.3d 740, 761 (7th Cir. 2019). Because this is a report and recommendation, I will analyze Edwards's probable cause challenge on its merits.

As the Court noted fifty years ago in *Brinegar v. United States*, 338 U.S. 160 (1949),

> In dealing with probable cause, . . . as the very name implies, we are dealing with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.

> *Id.* at 175.

More recently, the Court observed that

> The test for probable cause is not reducible to precise definition or quantification. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence have no place in the probable cause decision. All we have required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act.

> In evaluating whether the State has met this practical and commonsensical standard, we have consistently looked to the totality of the circumstances. We have rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach. In *Gates,* for example, we abandoned our old test for assessing the reliability of informants' tips because it had devolved into a complex superstructure of evidentiary and analytical rules, any one of which, if not complied with, would derail a finding of probable cause. We lamented the development of a list of inflexible, independent requirements applicable in every

24

> case.  Probable cause, we emphasized, is a fluid concept– turning on the assessment of probabilities in particular factual contexts– not readily, or even usefully, reduced to a neat set of legal rules.

*Florida v. Harris*, 568 U.S. 237, 244 (2013)

When reviewing a state search warrant, this court is to give great deference to the issuing judge's determination so long as the judge had a substantial basis for the finding.  *United States v. Adams,* 934 F.3d 720, 725 (7ᵗʰ Cir. 2019).

> Probable cause exists when the circumstances indicate a reasonable probability that evidence of crime will be found in a particular location; neither an absolute certainty nor even a preponderance of the evidence is necessary.

*Id.* at 725.

Det. Schultz's warrant application meets this threshold.  Judge Remington was presented with persuasive evidence that the person who robbed Neil's Liquor on November 4, 2019 had parked his getaway vehicle on Middleton Beach Road, but then had lost the keys on his way back over the footbridge.  This getaway delay gave the police the opportunity to identify the vehicle as Edward's Outlander before the robber returned to the scene, recovered the keys and drove the Outlander away.  Jeremiah Edwards was the person making payments on the Outlander.  Edwards previously had been arrested five times previously for armed robbery.  This information sufficed to support issuance of the warrant.  Even if this were a closer call, the police would have been entitled to rely on this warrant under the good faith doctrine, *see, e.g., United States v. Adams*, 934 F.3d 720, 726-27 (7ᵗʰ Cir. 2019); *Edmond v. United States*, 899 F.3d 446, 451-52 (7ᵗʰ Cir. 2018).  This court should deny the motion to quash.  But Edwards isn't done attacking the tracking device:

**II. Motion To Quash the Tracking Warrant: The Reported Installation Date (dkt. 68)**

When Det. Schultz returned the tracking warrant on November 9, 2018, *see* dkt. 68-1, he mistakenly wrote the wrong date: "by virtue of the Court's Order, I installed the GPS Tracking Device in accordance with this Order on 10/07/18 @ 23:49." This caused Edwards to move to suppress all evidence derived as a result of the tracking device having been put on his Outlander because "there is no warrant for the installation of a GPS unit on that date." Dkt. 68 at 2. This last statement is true: Det. Schultz applied for the tracking device warrant on November 7, 2018, and the court issued the warrant that same day.

Det. Schultz explained his mistake at the evidentiary hearing, and the court has accepted his explanation, *see supra* at 6-7. That would seem to be the end of it. Indeed, after the evidentiary hearing, Edwards, by counsel, submitted a letter stating that he had "no additional arguments" to submit in support of this motion. Dkt. 100. This reasonably could be interpreted as a concession that the motion had no traction in light of Det. Schultz's testimony. That's how the government read it, because it did not file a response brief. In a "*gotcha!*" reply (dkt. 113), Edwards proclaimed that in the absence of a government response, the court should deem the government to have conceded the motion, which required the court to suppress the evidence derived from the tracking device. That is not going to happen.

This is another example of Edwards refusing to let the facts get in the way of his arguments. The police did not install the tracking device on the Outlander on October 7, 2018, they installed it on November 7, 2018, just before midnight. The fact that Det. Schultz mistakenly wrote a "10" instead of an "11" on his subsequent return does not change–cannot change– what actually happened. There is no legal or factual basis to grant this motion.

26

### III. Motion To Quash Woods's Identification of Edwards (dkt. 65)

Edwards has  moved to quash Woods's identification of him as her confederate during the November 11, 2018 robbery and to prohibit her from attempting to identify him at his trial. The first half of this motion has some traction, the second half does not.

In his pre-hearing motion, Edwards provides an overview of the video recording of Woods's interaction with and interrogation by the police, contending that what can be seen and heard establishes that the police employed coercive and unnecessarily suggestive tactics that caused Woods incorrectly to identify Edwards as her confederate and irreparably tainted her ability accurately to identify the actual robber.  *See* dkt. 65.  In his post-hearing brief, Edwards again walks through the video recording, then repeats his argument that Det. Johnson engaged in an identification procedure that was both suggestive and unnecessary.  The essence of the government response (dkt. 107) is that there is not a substantial likelihood that Woods misidentified Edwards as her co-robber, and there is no taint on her ability accurately to identify the robber at trial.  Although Edwards makes some valid points, the government is correct.

Before we get to the *Manson* factors, the court needs to address the overarching theme of Edwards's motion:  Woods is lying about him.  According to Edwards, someone else was in the car with Woods that night, but now she is lying about him in order to tell the police what they want to hear.  Woods indisputably tossed buckets of lies to Det. Johnson in the first half of her November 11, 2018 interrogation.  Even so, I saw and heard Woods testify on direct and cross examination, I have considered her testimony in light of most of the evidence and

27

circumstances available to the court,[13] and I have found and concluded that her version of events naming Edwards as the prime mover behind the O'Reilly's robbery is true and accurate.[14]

In determining whether a particular identification procedure violates a defendant's due process rights, the court first considers whether the police used an impermissibly suggestive procedure in obtaining the out-of-court identification.[15]   If so, then the second inquiry is whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.  *United States v. Gonzalez*, 863 F.3d 576, 584 (7th Cir. 2017)(quoting *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977) and citing *Simmons v. United States*, 390 U.S. 377, 384 (1968), and *United States v. Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009)).  Due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.  *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012).   Even then, suppression of the resulting identification is not the inevitable consequence.  In other words, improper police conduct is a necessary starting point, but it simply triggers the reliability analysis.  It is not a basis, standing alone, to suppress an identification.

---

[13]   When determining Woods's credibility, I have not considered the hat or the handgun with Edwards's DNA on it found stashed in Outlander's headliner.  Those items are the subject of a separate suppression motion addressed below.  Although I am recommending that the court not suppress this evidence, it's a wobbler, so I am keeping my credibility determination clean by eschewing reliance on the evidence seized pursuant to the second search warrant.

[14]   If I were to indulge in skeptical speculation, I could hypothesize a scenario in which Woods was a more willing participant in this robbery than she currently is proclaiming, but there is no evidence to support any such conjecture, and it wouldn't help Edwards even if Woods actually was all-in on the robbery.

[15]   For the most part, this gloss of the law is recycled from my September 8, 2017 Report and Recommendation in *United States v. Thomas*, 16-cr-44-wmc-2, dkt. 119.

Instead, courts are to assess on a case-by-case basis whether improper police conduct created a substantial likelihood of misidentification.  The lynchpin of the analysis is the reliability of the identification that resulted, with the court weighing the indicators of the witness's ability to make an accurate identification against the corrupting effect of law enforcement suggestion.  *Id.*, citations omitted.  Although not exclusive, the five standard factors that courts consider are:  (1) the witness's opportunity to view the actual perpetrator; (2) her degree of attention; (3) the accuracy of any description provided; (4) the witness's level of certainty of her identification; and (5) the time lapse between the crime and the confrontation. *Manson*, 432 U.S. at 114-15.  *See also Coleman v. City of Peoria, Ill.,* 925 F.3d 336, 347 (7th Cir. 2019)(due process requires the exclusion of an eyewitness identification "if the unduly suggestive circumstances are so egregious as to taint the entire trial"; but "even where undisputedly suggestive circumstances surround an identification, the Fourteenth Amendment test looks at the totality of the circumstances to determine whether the identification remains sufficiently reliable to still be admitted.")

While there has been some jurisprudential equivocation whether the use of a single photograph constitutes an impermissibly suggestive identification procedure – *see, e.g., United States v. Sanders*, 708 F.3d 976, 985-86 (7th Cir. 2013)(in dicta) – the court in *Gonzalez* accepted the government's concession that this procedure was "both suggestive and unnecessary" on the facts of the case, then offered an exegesis of the reasons why: "Photographs of only one suspect were displayed, telegraphing to Miller [*the victim bank teller*] that the police thought this was the robber."  863 F.3d at 584.  Further, at the suppression hearing, the court asked Miller "if she

assumed that the officer 'was showing her pictures of somebody that somebody believed had robbed the bank' and she replied, 'a potential, yes.'" *Id*.

Based on *Gonzalez*, it was both suggestive and unnecessary for Det. Johnson to present a single photograph to Woods when asking her to identify the other robber. As Edwards notes, in *Thomas*, this court rejected as unfounded the government's argument that it is not suggestive to show a single photograph to an investigative target as opposed to a victim or a civilian witness. As noted in *Thomas*, it is not clear where investigators came up with this artificial distinction because it is not supported by the case law. This policy appears to be based on the assumption that the bad guys already all know each other, so their ability to identify their accomplices is *per se* reliable and therefore incapable of being tainted by suggestive identification procedures. This assumption probably is correct some – or even most – of the time, but it is not correct *all* of the time. It depends on the fact situation presented – that is, the totality of circumstances test that undergirds the court's reliability determination. In *Thomas*, this led me to recommend that the trial judge see and hear testimony from the getaway driver (who had not testified at the initial evidentiary hearing) to determine whether the FBI's use of a single photo of their suspect had tainted her ability to identify the robber whom she had met for the first time the morning of the bank job. *See* Case No. 16-cr-44, dkt. 119 at 14.

In this case, I have seen and heard Woods testify and I have no hesitation concluding that her two identifications of the photograph of Edwards as her confederate were accurate, and that neither Det. Johnson nor anyone else tainted Woods's ability to identify Edwards at trial.

Let's start with the first time Woods saw the upside-down picture of Edwards in Det. Johnson's binder. Edwards claims that this was an intentional act by Det. Johnson. My review

of the interrogation video convinces me that this *was* intentional, but not for the purpose of inducing Woods to identify Edwards as the robber.  Rather, Det. Johnson wanted Woods to see the photograph because he wanted her to know that Det. Johnson knew that she was lying to him.  The message sent was the message received:

> Q:     Did you see that, where he opened the binder and there was a
>        picture in there?
>
> A:     Yes.
>
> Q:     Did you see that picture, Kanasha?
>
> A.     Yes.
>
> Q.     Okay.  Did you recognize who was in that picture right away?
>
> A:     Yes.
>
> Q:     Okay.  What did you think when you saw that picture?
>
> A:     That they already knew what happened.

Transcript, dkt. 88, at 84.

This exchange does not advance Edwards's argument for suppression.  To paraphrase the court in *United States v. Recendiz,* If Edwards was *not* actually Woods's confederate, then nothing about this sequence of events suggested to Woods that she was supposed to identify the man in the photograph as the robber.  557 F.3d 511, 525 (7th Cir. 2009).  At this juncture in the interview Woods still was propounding her false tale, and Det. Johnson did not provide any statements or cues as to what he wanted her to do.  There would be no logical reason for Woods to surmise that Det. Johnson was coaching her to identify this man as the other robber.  If that were to have been his intent–and I have found that it was not–then logic and common sense both suggest that Det. Johnson would have been much clearer about it, lest his effort fail because

it was too opaque.[16]  But it wasn't his intent, because Woods had not yet turned the corner and abandoned her fictive account of that night's activities.

But in the end, Det. Johnson's intent is irrelevant.  Circuit law suggests that this court is to view a one-photo show-up as suggestive, and here, Woods's exposure to Edwards's picture qualifies as a one-photo show-up.  The same is true for Det. Johnson's formal presentation of Edwards's picture to Woods later in the interview when he *did* clearly intend to seek an identification.  Both times, it was unnecessary for Det. Johnson to employ the one-photo procedure that he chose to use.

So the operative question for both of Woods's exposures to Edwards's photograph becomes a determination of taint.  That's because an unduly suggestive identification procedure is not subject to suppression if it is sufficiently reliable to prevent a very substantial likelihood or irreparable misidentification.  *Recendiz*, 557 F.3d at 525.  "Reliability is the linchpin in determining the admissibility of identification testimony."  *Id.*, quoting *Manson v. Brathwaite*, 432 U.S. 96, 114 (1977).

Here, there was no taint. Both of Woods's identifications of Edwards from the photograph are reliable. As Woods explained, when she subsequently *volunteered* to Det. Johnson that the man in the picture was the other robber, she did so "because that was the person I did the robbery with," not because she was intimidated by the police[17] and not because she was just

---

[16]   For instance, in *Thomas*, as the agent handed a single photograph of the defendant to the getaway driver, he said "All right.  And then the other guy who got in [*the van*] I'm assuming, based on what we know . . .."  (16-cr-44, dkt. 119 at 6).

[17]   Edwards latches onto the diatribe unleashed by the officer carrying a long gun who confronted Woods before Det. Woods began the actual interrogation.  This could be viewed as a bad cop/good cop attempt, but when viewed in the context of what followed, clearly this was no more than unauthorized venting by a frustrated officer who should have known better.  All he did was irritate Woods.  It had no effect whatsoever on Woods's subsequent identification of Edwards.

telling them what she thought they wanted her to say.  Transcript, dkt. 88, at 84-85.  Having heard and seen Woods testify, and having considered all of the other relevant circumstances, I have accepted this testimony as true.

This segues to the five factors the court is to consider when concluding that Woods's identification of Edwards is reliable, *supra* at 29, which I will address in order:

(1)&(2) Woods's opportunity to view the actual perpetrator and her degree of attention: As the fact found above establish, Woods knew Edwards before the night of the robbery as a result of having seen him at the temple during services.  Woods also saw Edwards at the temple on the night of the robbery, then spent most of the next two hours with him inside the Outlander while they smoked dope, discussed marijuana dealing, prepared for the robbery, committed the robbery, fled the scene at normal speed, then fled the police at high speed before crashing and fleeing in separate directions.  Her degree of attention to him was well-above-average given the activities in which the two of them engaged that night.

(3) The accuracy of Woods's description of the robber: Edwards points out that Woods at first described some guy named "Moe" and spun a tale that had nothing to do with Edwards.  But once she threw her lot with the police, Woods provided an accurate description of Edwards.  Tellingly, Woods described Edwards as bald; in the booking photo she was shown, Edwards had hair.  Before committing to her identification, Woods used her hands to cover the hair to ensure that this was a picture of the man with whom she had robbed O'Reilly's.  She stated "he's bald now," which was an accurate description of Edwards in 2018.  Woods would not have made this correction if her goal was simply to tell Det. Johnson what she thought he wanted to hear.

(4) Woods's level of certainty: Woods is certain of her identification.  As noted above, during her interrogation Woods instantly recognized Edwards from an upside-down photo to which she was briefly exposed without explanation.  Woods has never wavered from that identification.

(5) The time lapse between the crime and the confrontation: Edwards and Woods parted ways at about 7:10 that evening.  Less than four hours later Woods identified Edwards as the other robber.  This time lapse is insignificant.

The bottom line is that Woods's two identifications of Edwards on November 8, 2018 are reliable.  There was no coercion.  Woods is not merely telling the authorities what she thinks they want to hear.  Although circuit law seems to frown upon the use of a single photograph when attempting to elicit the identification of a suspect, this did not taint Woods's identification of Edwards.  The fact that Det. Johnson made a tactical decision to show Woods a photograph in order to persuade her to stop lying is not a basis to suppress her identification of Edwards.  Because there is no taint here, Woods should be allowed to attempt to identify Edwards at his trial.  The court should deny all aspects of Edwards' motion to suppress identification.

## IV. Motion To Quash Outlander Search: Untimely Warrant Return (Dkt. 69)

Edwards has moved to suppress all evidence recovered from the Outlander during execution of Judge Bailey-Rihn's November 9, 2019 search warrant.  As grounds, Edwards claims that the officers failed to return the results of the search in a timely manner and failed to report

in the return the date and time of the search.  According to Edwards, "A proper sanction for failing to follow Rule 41 is suppression [*of*] the fruits of the search."  Dkt. 69 at 1.

Judge Bailey-Rihn's warrant required a return within 48 hours of the search, which would have been November 11, 2019, so the return was a day late.  Edwards also invokes *Federal* Rule of Criminal Procedure 41(f)(1)(A) (although he calls it a Federal Rule of Evidence) for the proposition that the return must state the exact date and time the warrant was executed.  That was not done here, but then again, it was a state court warrant, so it's not clear why it would be subject to a federal procedural rule.  In any event, Edwards calls for the suppression of all evidence seized from the Outlander based on these actual and perceived violations.  *See* dkt. 69 at 3.

In an August 5, 2019 letter to the court (preceding the evidentiary hearing), the government responded that it was legally incorrect for Edwards to argue that suppression is the remedy for the late return of a warrant, that F.R. Crim. Pro. 41 does not apply here, but that even if it did, suppression was not the remedy for technical violations.  *See* dkt. 70.

In his September 27, 2019 letter to the court (dkt. 100), Edwards reported that he was not submitting a brief in support of this motion, but would rely on the authority and argument provided in the motion.  The government did not file a response, likely because it already had done so in its August 5 letter; even so, Edwards pounced again, claiming that his motion should be granted as unopposed.  *See* dkt. 113.

Actually, the government had the last word on August 5, so perhaps it is Edwards who has waived his arguments.  Regardless, I am hewing to my no-waiver approach and addressing this motion on its merits.

First, the Federal Rules of Criminal Procedure do not govern the actions of state law enforcement officers when, at least at the time of the actions in question, there was no federal involvement in the investigation. *United States v. Taylor*, 979 F.Supp.2d 865, 869 (S.D. Ind. 2013). Even if federal rules *did* apply, the failure to comply with the procedural requirements of Rule 41 is not generally viewed as a deprivation of rights under the Fourth Amendment that requires the exclusion of the seized evidence. *United States v. Kelly*, 14 F.3d 1169, 1173-74 (7th Cir. 1994). As Judge Mihm explained in an unpublished opinion,

> The Supreme Court has held that rules of procedure are not to be applied to effect a "statutory expansion of the exclusionary rule." *United States v. Calandra*, 414 U.S. 338, 348 (1974). In other words, "foibles in the administration of Rule 41 are not grounds for exclusion." *United States v. Hornick*, 815 F.2d 1156, 1158 (7th Cir. 1987) . . . Only where a defendant can show prejudice or that there was an intentional or deliberate disregard of the requirements may suppression be warranted, and neither has been established here. *United States v. Kelly*, 14 F.3d 1169, 1173 (7th Cir. 1994).

> *United States v. Tylman*, 2007 WL 2669567 at *11 (C.D. Ill. 2007).

Finally, under Wisconsin law,

> The timely return of a warrant is a ministerial duty which does not affect the validity of the search absent prejudice to the defendant. The overwhelming weight of authority is to the effect that required warrant return procedures are ministerial and that failure to comply with them is not a ground for voiding an otherwise valid search.

> *State v. Sveum*, 328 Wis.2d 369, 408 (2010).

In other words, Edwards, by counsel, filed a motion to suppress that had no support in law or procedure, state or federal. Then, after Edwards chose not to brief this unfounded motion, he accused the government of waiving its opposition, which entitled him to victory by default. There is no legal or factual basis to grant this motion.

### IV. Detective Johnson's Re-entry into the Outlander (dkt. 66)

Edwards has moved to suppress the Glock and the hat seized from the headliner of the Outlander because the federal warrant that led to their recovery derived from Det. Johnson's warrantless search of the Outlander on January 1, 2019 when he was looking for Woods's purse and wallet. Edwards points out that the police already had searched the Outlander pursuant to a state search warrant, "leaving no reason to believe evidence of a crime would still remain in the vehicle." But for Det. Johnson's unwarranted entry into the Outlander, the FBI never would have sought a second warrant to retrieve the firearm that Det. Johnson saw when he bumped loose the overhead sunglasses case. (Dkt. 98). If this information is removed, then there would have been no articulated basis for this court to issue the warrant. *See United States v. Bell*, 925 F.3d 362, 370 (7th Cir. 2019).

The government responds that this wasn't actually a "search" by Det. Johnson because he wasn't looking for evidence of a crime, he was looking for Woods's purse. Even if Det. Johnson should not have re-entered the Outlander, says the government, he did not do so with the intent to search for evidence, which means his acts fall within the Good Faith Doctrine of *United States v. Leon*, 468 U.S. 897, 926 (1984). In reply, Edwards reiterates his position that absent an exception to the warrant requirement, there was no basis for Det. Edwards to enter the Outlander. Edwards also flags what he calls a "nuance . . . regarding ownership interest": Woods didn't have any. Dkt. 111.

It is true that Woods had no proprietary interest in the Outlander. But did *Edwards* still have a reasonable expectation of privacy in the Outlander on January 1, 2019? The facts found above establish that Edwards abandoned the Outlander when he crashed it and fled following

the police chase. The record does not reflect that Edwards ever made an attempt to retrieve his vehicle from the police; all the court knows is that Edwards went missing for four months, when he was arrested in Chicago.[18]

Abandoned property is not subject to Fourth Amendment protection. A defendant objecting to a search bears the burden of proving a legitimate expectation of privacy in the area searched. No person can have a reasonable expectation of privacy in an item that he has abandoned. It is the government's burden to prove by a preponderance of the evidence that the defendant's voluntary words or actions would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item to be searched. This is an objective test, and a defendant's subjective desire later to reclaim an item is irrelevant. The court looks solely to the external manifestations of the defendant's intent as judged by a reasonable person possessing the same knowledge available to the officer involved in the search. *United States v. Pitts*, 322 F.3d 449, 455-56 (7th Cir. 2003). *See also Long v. Brown*, 2015 WL 4041541 (S.D. Ind. 2015) at *4 (collecting cases holding that a driver who runs from his vehicle at the sight of police has abandoned it and thus has relinquished his Fourth Amendment right to the vehicle). Applying this law to the facts found above would augur a ruling that Edwards has relinquished his right to challenge any of the searches of the Outlander.

---

[18] As noted earlier in this report and recommendation, after the evidentiary hearing, Edwards filed a notice of alibi (dkt. 91, under seal) which is not before the court at this time, but I will offer two observations: First, the evidence presented by both sides on the pretrial motions has led me to conclude that Edwards was driving the Outlander that night, and that Edwards fled after crashing. Second, Edwards's alibi is for the period 5:45 p.m. to 7:15 p.m. on November 8, 2018. There is no evidence in the record that Edwards made any attempt–or that he was unable to make an attempt– to locate and claim his Outlander after it went missing (by his account) on the evening of November 8.

All of this being so, the government has not claimed abandonment and neither side has briefed the issue. As announced above, I am declining to find waiver or forfeiture by either side in this report and recommendation, so I leave it to Judge Peterson to determine whether and how he wishes to consider abandonment. As part of this, Judge Peterson has the right to invite further briefing or even re-open the evidentiary hearing if he wishes. *See* 28 U.S.C. § 636(b). If, however, Judge Peterson accepts my next recommendation, that suppression is a disproportionate remedy to the harm claimed by Edwards, then there would be no need for additional input from the parties.

I will continue the instant analysis by addressing the arguments the parties actually have made. The government contends that it was not a "search" for Det. Johnson to enter the Outlander to look for Woods's purse because he wasn't looking for evidence of a crime. This is a novel assertion for which the government provides no supporting case law. The police cannot simply enter and rummage through some guy's car just because a previous passenger says she left her purse in it. That said, 34 years ago, Judge Aspen held in a civil case that

> Not every warrantless entry upon an individual's property is a search within the meaning of the Fourth Amendment. A search generally involves some effort by government authorities to obtain evidence of criminal conduct. It is clear that the Lyons police officers were making no such efforts in this case.
>
> *Schiefelbein v. Schiefelbein*, 1985 WL 2676 (N.D. Ill. 1985) at *1, citations omitted.

This is a weak jurisprudential peg on which to hang a ruling in this case, but it provides an adequate segue to the question "whether the purposes of the exclusionary rule are even implicated in this case." *United States v. Lowe*, 516 F.3d 580 (7th Cir. 2008). The court continued:

To be sure, the Supreme Court has clearly stated that the "prime purpose of the exclusionary rule, if not the sole one, is to deter future unlawful police conduct." Hence we must ask ourselves precisely what type of police misconduct would be deterred in the future if we were to suppress evidence from the search in this case.

*Id*, citations omitted.

As the court explained in *United States v. Kienast*, 907 F.3d 522, 527 (7th Cir. 2018),

Suppression of evidence is a "last resort." It is not a personal constitutional right, nor is it intended to remedy the injury of having one's rights violated. Instead, it is a judge-made rule meant to deter future Fourth Amendment violations. And its application has been strictly limited by the Supreme Court.

The Court has instructed that the exclusionary rule be limited to cases in which its deterrent effect on police conduct will outweigh its "heavy costs." Strong cases for exclusion involve deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights on the part of the police. In such cases, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But exclusion is not appropriate where the police act with an objectively reasonable good-faith belief that their conduct is lawful. In that type of case, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

*Id.* at 584, citations omitted.

In *United States v. Espinoza*, 256 F.3d 718 (7th Cir. 2001), the court titled Section C. of its analysis "The Exclusion of Evidence Is a Disproportionately Severe Sanction in Cases Where the Police Conduct Does Not Actually Harm Protected Interests." *Id.* at 725. The court explained that

Where the violation of the Fourth Amendment in a particular case causes no discernable harm to the interests of an individual protected by the particular constitutional prohibition at issue . . . the exclusion of evidence for the trial is a disproportionately severe and inappropriate sanction. In other words, the principle of proportionality demands that the application of the exclusionary rule should be limited only to those instances where the

40

> constitutional violation has caused actual harm to the interest
> (whether in privacy or in a fair trial) that the rights protect.

*Id., quoting United States v. Stefonek*, 179 F.3d 1030, 1034-36 (7th Cir. 1999).

Applying these principles to the instant case shows that Edwards is not entitled to suppression of the evidence derived from Det. Johnson's warrantless entry into the Outlander to look for Woods's purse. To the extent that Edwards had any expectation of privacy in the Outlander after he crashed it and fled, this expectation was superseded and extinguished by the state court's search warrant issued the next day, a warrant that Edwards has not challenged.

When probable cause exists to search an automobile, officers are permitted to search all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments. *United States v. Scott*, 516 F.3d 587, 589 (7th Cir. 2008). This would include any traps or hidden compartments within a vehicle, which are routinely encountered by law enforcement officers, *see, e.g., United States v. Daniels,* 803 F.3d 335, 350 (7th Cir. 2015) (defendant had two handguns hidden in "trap compartment" in dashboard of his Chrysler 300); *United States v. Covarrubias*, 65 F.3d 1362, 1356-66 (7th Cir. 1995) (defendant constructed hidden compartment in the trunk of his car to hide drugs and a handgun); *United States v. Seymour*, 519 F.3d 700, 705 (7th Cir. 2008) (defendant's "Organization" drove cars with hidden trap compartments where concealed guns and drugs); *United States v. Moreno*, 922 F.3d 787, 791 (7th Cir. 2019) (defendant's truck had hidden trap compartment); *United States v. Maldonado*, 893 F.3d 480, 483 (7th Cir. 2018)(defendant's Cadillac had trap compartment for drugs and money).

If the officers who executed the state search warrant for the Outlander had performed their assignment more diligently, then they would have manipulated the overhead sunglasses

41

compartment and discovered the handgun and hat cached above the headliner. The fact that the officers failed to detect these items–which Edwards had hidden in a hard-to-find spot for the very purpose of avoiding detection[19]– did not reanimate any privacy right in the Outlander's contents that the search warrant already had extinguished. Therefore, Det. Johnson's post-search entry could not have actually harmed any protected interest that Edwards ever had in the Outlander.

Even so, once the police returned the warrant, technically they could not search it again. But there would be no constitutional prohibition against a genuinely ministerial re-entry, for instance to perform a by-the-book inventory search, or to start the Outlander and put it into gear to tow it out of the impound building. Det. Johnson's re-entry to look for Woods's purse qualifies as such a ministerial reentry. Det. Johnson is capable of guile, but he did not employ it here. The evidence establishes that Det. Johnson really was just looking for the purse. Logic and common sense support this conclusion: he had no reason to doubt the thoroughness of the search performed by his colleagues, and Woods's attorney actually had made the request that led to this re-entry. Upon accidently dislodging the sunglasses holder, Det. Johnson immediately exited the Outlander and sought advice from a federal prosecutor, who directed what should happen next. No actual searching was done until the FBI had obtained a warrant from this court to retrieve what Det. Johnson had fortuitously discovered.

Therefore, there is no police misconduct of any degree that would merit the sanction of exclusion in this situation. Even if one were to second-guess Det. Johnson's entry into the

---

[19] Because Edwards's DNA was recovered from the Glock, it is fair to conclude from the evidence before the court that he put it there after re-entering the Outlander following the robbery.

Outlander—should he instead have refused the request? Sought another search warrant to look for the purse?—the penalty of exclusion would be an inappropriate and highly disproportionate penalty. This is not one of those rare instances where a constitutional violation has caused actual harm to a privacy interest protected by the Fourth Amendment. This court should deny Edwards's motion to suppress the handgun and hat recovered from the Outlander when the second search warrant was executed.

## RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court deny all five of defendant Jeremiah Edwards's motions to suppress evidence.

Entered this 20th day of November, 2019.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Madison, Wisconsin  53703

Chambers of                                                                                          Telephone
STEPHEN L. CROCKER                                                              (608) 264-5153
U.S. Magistrate Judge

November 20, 2019

Daniel Graber
United States Attorney's Office
222 West Washington Ave., Ste. 700
Madison, WI 53703

William R. Jones
Jones Law Firm
P.O. Box 44188
Madison, WI 53744

     Re:    United States v. Jeremiah Edwards
             Case No. 18-cr-162-jdp

Dear Counsel:

     The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

     The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

     In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before December 6, 2019, by filing a memorandum with the court with a copy to opposing counsel.

     If no memorandum is received by December 6, 2019, the court will proceed to consider the magistrate judge's Report and Recommendation.

                  Sincerely,

                  /s/

                  Susan Vogel for Connie A. Korth
                  Secretary to Magistrate Judge Crocker

Enclosures

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth

with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* **462 F.3d 684, 688 (7th Cir. 2006).**