IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

          Plaintiff,

v.

JEREMIAH D. EDWARDS,

          Defendant.

OPINION and ORDER

18-cr-162-jdp

---

Defendant Jeremiah D. Edwards is charged in a superseding indictment with several counts relating to the armed robbery of an auto parts store, and with two counts relating to the possession with intent to deliver marijuana. Dkt. 77. His co-defendant, Kanasha Woods, pleaded guilty to one count of Hobbs Act robbery and has already been sentenced. Dkt. 61.

Edwards has filed five motions to suppress evidence. Dkts. 65–69. Magistrate Judge Stephen Crocker held an evidentiary hearing on the motions on August 30, 2019. After post-hearing briefing, Judge Crocker issued a Report and Recommendation that the motions be denied. Dkt. 114. Edwards objects. Dkt. 117. Pursuant to 28 U.S.C. § 636(b)(1) and this court's standing order, I am required to review de novo the objected-to portions of the Report and Recommendation. After the Report and Recommendation issued, Edwards filed a motion to supplement the record with a late-disclosed police report. Dkt. 118.

Edwards objects more or less to everything in the Report and Recommendation. He formats his objections in a chart listing 28 points of disagreement, followed by some general observations about the credibility of Woods and one of the investigating officers. The chart identifies a lot of details, but it does not thoroughly explain why Judge Crocker's conclusions are flawed.

I've reviewed both sides' briefs, the transcript of the hearing, and the evidence submitted. I see no flaw in Judge Crocker's analysis, and I'll adopt his recommendation that I deny Edwards' motions. I won't go line-by-line through Edwards' chart; I'll focus on what I take to be Edwards' main substantive objections. And I will grant Edwards' motion to supplement the record, but the police report he submitted doesn't change the result.

ANALYSIS

The Report and Recommendation thoroughly recounts all the necessary background, Dkt. 114, at 2–19, so I won't repeat it here. Instead, I will focus on the three alleged constitutional violations asserted by Edwards: (1) Madison Police detective Caleb Johnson's handling of an identification procedure; (2) the second search of Edwards' SUV; and (3) the placement of a tracking device on the SUV.

A. Woods' identification of Edwards

In Dkt. 65, Edwards moves to suppress Woods' out-of-court identification of Edwards and to preclude her from identifying Edwards at trial. Edwards' main basis for this motion is that Madison Police detective Caleb Johnson induced Woods to identify Edwards by showing Woods a photograph of Edwards during a post-arrest interview (at about 54 minutes into the interview). At the hearing, Johnson testified that showing the photograph to Woods was an accident. Later in the interview, Woods confirmed that the man in the photograph, whom she then knew only as "Moe," was her accomplice in the robbery. Judge Crocker found that Johnson's hearing testimony was a lie; Johnson showed the photograph to let Woods know that the police already knew who was involved in the robbery. For the purpose of considering Edwards' objections, I will assume that Johnson's testimony on this issue was false.

2

Edwards contends that by showing Woods the photograph of Edwards, Johnson so tainted Woods' later identification that Woods' testimony is unreliable and should be excluded under *Perry v. New Hampshire*, 565 U.S. 228 (2012). Edwards' main point is that Johnson's showing of the Edwards' photograph was highly suggestive. Judge Crocker agreed, concluding that the single-photo show-up was both suggestive and unnecessary. Dkt. 114, at 30. But exclusion is not therefore automatic; the court must then determine whether police misconduct created "a very substantial likelihood of irreparable misidentification," *Perry*, 565 U.S. at 232. So, for the second step of the analysis, Judge Crocker applied the factors called for in *Manson v. Brathwaite*, 432 U.S. 98 (1977), concluding that Woods' identification was sufficiently reliable.

Edwards does not thoroughly engage Judge Crocker's analysis, but he makes three points that warrant discussion. First, Edwards says that Woods' description of Edwards could have been derived from the photo itself: bald, black, medium build. Dkt. 117, at 10. But Edwards is not entirely accurate: Woods also said that Edwards had a belly, which Edwards has not disputed. And Edwards is not bald in the photo. Edwards contends that the short amount of time that Woods saw the photo the first time led to a mistaken belief that Edwards was bald in the photo and that Woods was giving "a poorly-acted performance" when she later used her hand to cover up Edwards' hair in the photo as she considered whether the photo was of Edwards. Woods did that, Edwards says, to correct the discrepancy between her description in the photo. But I see nothing in the video of the interview to support Edwards' conjecture about her motives.

Second, Edwards reiterates his argument that Woods' identification wasn't reliable because her observations of Edwards were limited and impaired, Dkt 117, at 14–15, which he

3

says the Report and Recommendation did not address. I've reviewed these arguments and I do not find them persuasive. In the interview, Woods said she had poor vision and was intoxicated, but those statements were made early in the interview when she was still fending off the interrogation with lies and denials. She also said that "Moe" was sometimes masked and that she was stressed by being held as a hostage with a gun in her face. Despite these details, I am not persuaded that over the three hours she spent with Edwards, Woods did not get a good chance to see what he looked like, particularly because she already knew him from the Moorish Science Temple, which they both attended. The many lies told by Woods during the interview have to be viewed in perspective: criminal suspects commonly dissemble at the beginning of investigatory interviews; sometimes they decide to come clean after doing so. Woods' interview fits this pattern, and despite its flaws, the interview as a whole was not unduly suggestive or coercive.

Third, Edwards contends that Woods was intimidated by an officer in tactical gear at the beginning of her interview. Dkt. 117, at 12–13. Edwards complains that the Report and Recommendation dismisses the incident with a footnote. But a footnote is all that was warranted: Edwards describes this incident in his original brief, Dkt. 97, at 2–3, 7, but he cited no authority and made no argument that this interaction rendered her identification so unreliable as to be inadmissible. In his objections to the Report and Recommendation, he now contends that the interaction was part of a systematic effort to coerce Woods to give the testimony that Johnson wanted. But still he does not address the main point in the footnote: the officer's aggressive behavior appeared to have no effect on Woods. I've reviewed the video, and the interaction with the officer is not so intimidating as Edwards suggests. Woods later

complained to Johnson that she did not appreciate the interaction, which shows that Woods was sufficiently self-possessed to resist any such intimidation.

The basic principle under *Perry* is that, for the identification to be suppressed, indicators of reliability have to be outweighed by the corrupting influence of police suggestion. 565 U.S. at 724–25. Woods' identification does not have to be unimpeachable to be admissible, and Edwards has some bases to attempt to impeach her trial testimony at trial. I agree with Judge Crocker's assessment that Johnson's interview technique was unnecessarily suggestive, but that Woods' identification of Edwards was fundamentally reliable. Edwards' motion to suppress, Dkt. 65, is denied.

**B. Second search of the Outlander**

Edwards' Outlander SUV was searched twice, once by the Madison Police Department and once by the FBI. The first search uncovered several items, including a handgun. Edwards doesn't challenge the legality of the first search, but he moves to suppress evidence recovered during the second search. Dkt. 66.

The second search came about because Johnson had, on January 1, 2019, gone into the impounded Outlander to recover Woods' purse at the request of Woods' counsel. In the process of retrieving the purse, Johnson dislodged the sunglass compartment, and in the space behind the sunglass compartment, Johnson saw what he believed was the front sight of a Glock handgun. Johnson reported this to the assistant U.S. attorney. An FBI agent got a warrant, and on February 21, 2019, searched the Outlander a second time, recovering from the headliner of the Outlander a Glock handgun, which was later determined to have Edwards' DNA on it.

Edwards objects that he did not abandon the Outlander, so his continuing privacy interest should have precluded any warrantless search of the Outlander. Judge Crocker

5

contemplated the abandonment question, but expressly declined to find that Edwards had abandoned the vehicle, leaving that question to me. Dkt. 114, at 39. And I am not going to base my decision on Edwards' potential abandonment, so Edwards' objection on this point is immaterial.

Edwards' main objection is that Johnson lied about dislodging the sunglass compartment, and that his entry into the Outlander on January 1, 2019, constituted a warrantless search. I overrule Edwards' objection for several reasons.

First, I reject Edwards' contention that Johnson's explanation of how he dislodged the sunglasses compartment is absurd, implausible, and inconsistent with "simple physics." Dkt. 117, at 12, 15–16. There is no dispute about the facts that prompted Johnson to enter the Outlander: Woods' counsel asked for the return of Woods' purse; the purse wasn't among the inventoried evidence; Madison police figured that the purse was still in the Outlander; and the purse turned out to be in the back seat. Johnson said he reached for the purse while kneeling on the front passenger seat, and in the process bumped the sunglass compartment. I infer that the inadvertent bumping of the compartment is the part that Edwards thinks is implausible. But the compartment had been removed to stash a medium-sized handgun and a knit cap, which explains why it was vulnerable to being knocked out of place. And, as the government points out, the Outlander had already been searched by Madison police, so there was no reason for Johnson to suspect that there was further evidence in the Outlander. Edwards does not respond to the government's point. I find no inherent implausibility in Johnson's testimony that he inadvertently dislodged the sunglass compartment. It would have been a better practice for Johnson to have had a witness to his retrieval of the purse. And Johnson's lie during the

evidentiary hearing diminishes his credibility, but I won't infer that he has lied about everything in the case.

Second, the Glock was recovered pursuant to a search warrant based on an application by FBI agent Beth Boxwell. Dkt. 67-3. Edwards did not directly challenge this search warrant, and he does not attack the honesty of agent Boxwell, so any objection to the admission of the fruits of the search might be deemed to have been waived. The agents who conducted the second search and recovered the Glock would have been entitled to rely on the warrant under the good faith doctrine, *see United States v. Leon*, 468 U.S. 897, 922 (1984), which Edwards makes no attempt to overcome.

Third, Edwards does not respond to the analysis in the Report and Recommendation. Dkt. 114, at 39–43. Judge Crocker reasoned that Edwards' expectation of privacy in the Outlander was superseded and extinguished by the state-court warrant issued the day after Edwards crashed the Outlander and left the scene. The officers who searched the Outlander on November 9, 2018, were authorized to search it thoroughly, including any secret compartments. Had they searched more diligently, they would have found the Glock then. So Johnson's later entry of the vehicle did not actually harm any protected interest that Edwards had at that point. Johnson wouldn't have been authorized to conduct a search after the warrant was returned, but his entry was a legitimate ministerial entry to retrieve Woods' purse. Once he noticed what he thought was potentially incriminating evidence, he left the vehicle, resealed it, and took steps to get a warrant. Edwards responds to none of this analysis; he only objects to the conclusion that there was no police misconduct serious enough to warrant exclusion of the results of the February 21 search.

I agree with the analysis in the Report and Recommendation and I deny the motion to suppress the results of the February 21, 2020 search, Dkt. 66.

**C. Use of a tracking device**

Middleton Police Department detective David Schultz submitted an affidavit in support of an application for a warrant authorizing the placement of a tracking device on the Outlander. Two of Edwards' motions seek to quash the warrant and to suppress the evidence derived from it. In Dkt. 67, Edwards contends that Schultz was dishonest in the application, in violation of *Franks v. Delaware*, 438 U.S. 154 (1978), and that without the dishonest information, the warrant lacked probable cause. In Dkt. 68, Edwards contends that the tracking device was installed before the warrant issued.

I'll begin with the installation date issue. Schultz's warrant return was dated "9th day of November, 2018" but it stated that the tracking device had been installed on "10/7/2018." Edwards moves to suppress the tracking results because a device installed on "10/7/2018" would have been installed before it was authorized. Judge Crocker found that Schultz had mistakenly written "10" instead of "11" for the month on the warrant return, and that the tracking device was actually installed on November 7, after the warrant issued. Edwards does not directly object to this finding; he objects to the suggestion in the Report and Recommendation that he might have conceded the point. Edwards says that he stands on his submissions and that if anyone has conceded, it is the government. Regardless whether Edwards waived this argument, Judge Crocker's finding is amply supported: Schultz installed the tracking device on November 7 and simply made an error in filling out the return.

In Dkt. 67, Edwards contends that Schultz was dishonest in his warrant affidavit in two ways: first, that Schultz exaggerated what he could see in the surveillance videos that he used

8

to connect the robber of Neil's Liquor to the Outlander; and second, that Schultz misstated Edwards' criminal history. I agree with Edwards that the connection between the robber of the liquor store and the Outlander is critical to establishing probable cause for the tracking-device warrant. If Schultz intentionally misrepresented the video surveillance evidence to make that connection, the misrepresentation would constitute a *Franks* violation and undermine the probable cause supporting the warrant. But I disagree that Schultz misrepresented the video evidence.

Edwards' objections do not specify how Schultz mischaracterized the video evidence. Dkt. 117, at 4–6. Mostly Edwards complains that the Report and Recommendation mischaracterizes his arguments. The only specific complaint that Edwards makes is that the aerial photo of the area, Government Exhibit 23, does not show that the footbridge is the only way to get from the parking lot to Middleton Beach Road where the Outlander was parked. Based on my review, it appears that the footbridge is the only way to get from the parking lot where the Outlander was parked within a time that is consistent with what's seen on the video. Even if there were some hidden way to cross over to Middleton Beach Road, I don't see how that would undermine Schultz's reasonable interpretation of what was on the video.

The gist of Edwards' original motion was that Schultz put into his affidavit more than he could see on the video, intending to buttress the search warrant application with evidence that he did not really have. But, as the Report and Recommendation explains, Schultz demonstrated at the hearing how he got all the information in his affidavit. I've reviewed the surveillance videos, Schultz's affidavit, and his hearing testimony. I saw what Schultz saw in the videos. I see no basis to conclude that Schultz intended to mislead the judge who issued the warrant for the tracking device. Edwards concedes that the person in light pants who came

9

off the footbridge and crossed the parking lot was likely the robber of the liquor store. Schultz couldn't determine to a certainty that the Outlander was driven by the same person who came off the footbridge. But he did not overstate what he could garner from the video, and it was a reasonable interpretation of the video that the silhouette who passed by the Outlander was the same person who came over the footbridge and crossed the parking lot, heading in the direction of the liquor store. The video establishes a probable connection between the likely robber and the Outlander.

The second alleged point of dishonesty concerns Schultz's description of Edwards' criminal history. In his original brief, Dkt. 99, Edwards says it was a material representation to say that Edwards had an extensive criminal history based solely on the arrests cited in the affidavit. In his objections, Dkt. 117, at 6, Edwards contends that Schultz omitted the material fact that only one of the five cited arrests resulted in a conviction. Arrests are part of a criminal history, and Schultz was aware of additional history that he could have included. Edwards' criminal history includes five felony convictions and 15 arrests. I agree with Judge Crocker that there is no basis to conclude that Schultz's description of Edwards' criminal history was intended to mislead the issuing judge, or that the issue judge was misled.

Edwards does not object to the probable cause determination apart from his *Franks*-based objection to the Schultz affidavit. So, with the *Franks* objection overruled, the warrant application establishes probable cause to issue the warrant. Edwards' motions to suppress, Dkt. 67 and Dkt. 68, are denied.

**D. Motion to supplement the record**

After the Report and Recommendation issued, Edwards filed a motion to supplement the record with a late-disclosed report of Madison police sergeant Matt Schroedl. Dkt. 118.

Schroedl's report describes his surveillance of Edwards and the Outlander on November 8, 2018, the day of the robbery of the auto parts store. Edwards contends that Schroedl's report further undermines Johnson's credibility and shows more police misconduct. The government has responded with affidavits from Schroedl and Johnson explaining the apparent inconsistencies between Schroedl's report and Johnson's testimony. Dkt. 120. Edwards has filed a reply. Dkt. 122.

I'll consider the Schroedl report, but not the affidavits. It wouldn't be fair to accept the affidavits without allowing Edwards the opportunity for cross-examination. And ultimately the report is not significant to my decision on the motions to suppress.

Schroedl was asked to tail the Outlander, and to attempt to confirm the identification of its driver, believed to be Edwards. With the assistance of location information from the tracking device, Schroedl followed the Outlander from about 3:00 p.m. until it parked near the Moorish Science Temple on Gilman Street in Madison at 4:24 p.m. Schroedl kept an eye on the Outlander until about 5:15 p.m. Schroedl saw a black male leave the Outlander and enter the temple. He later saw the same person come back to the Outlander, remove something from the trunk, and return to the temple. Schroedl's report provides the following description of the driver:

> I was able to observe the m/b had more of a round face and head. Again, I was not able to confirm or verify the individual I was observing was Edwards but the individual was consistent with his physical appearance.

Dkt. 118-1.

Schroedl's report is inconsistent with Johnson's hearing testimony in two ways. Johnson testified that Edwards was spotted at the Moorish Science Temple on November 7, before the

GPS device was installed. Schroedl's report says it was November 8, and that he had the benefit of GPS tracking information. Second, Johnson testified:

> I talked to Madison Police Department Sergeant Schroedl, and he told me he personally observed on the surveillance operation the vehicle parked near the temple and who he recognized as Jeremiah Edwards exit the driver's seat of the vehicle.

Dkt. 88, 48:7–11. Edwards contends that the second inconsistency is important: Johnson testified that Schroedl recognized Edwards; but Schroedl's report says only that he saw a black man consistent with Edwards' description.

Edwards argues that Johnson's testimony about Schroedl's positive identification was important to Judge Crocker's determination that Woods' identification of Edwards was reliable. That is a stretch. Edwards is correct that the fact section of the Report and Recommendation says that Madison police positively identified Edwards driving the Outlander at the Moorish Science Temple. Dkt. 114, at 5. But Judge Crocker does not cite Schroedl's identification of Edwards in the analysis of Woods' identification of Edwards. *Id*. at 27–36. It's not true, as Edwards says, that "the R&R found Ms. Woods to be credible based on this testimony." Dkt. 118, at 4. Nowhere does the Report and Recommendation rely on Schroedl's identification of Edwards.

Edwards also argues that the Schroedl report shows perjury by Johnson, providing another example of police misconduct, as does the withholding of the report from the U.S. attorneys. Characterizing Johnson's erroneous testimony as perjury is another stretch, and Edwards cites no evidence that the report was intentionally withheld.

Schroedl's surveillance of the Outlander could be significant only as a piece of evidence connecting Edwards to the Outlander. But ample evidence connects Edwards to the Outlander, particularly the statements of Edwards' ex-girlfriend who is the registered owner, and Connie

12

Burrell, who took Edwards back to Middleton Beach Road to help him look for the keys to the Outlander. Johnson's erroneous testimony that Schroedl positively identified Edwards is an understandable error by either Johnson or Schroedl, and Edwards cites no evidence that suggests that either of them misstated evidence intentionally. Johnson's testimony about Schroedl's surveillance could be disregarded entirely without affecting the decision on any of Edwards' motions to suppress. I conclude that this erroneous testimony suggests no police misconduct.

## ORDER

IT IS ORDERED that

1. The magistrate judge's report and recommendation, Dkt. 114, is ADOPTED.

2. Defendant Jeremiah Edwards' motions to suppress, Dkt. 65, Dkt. 66, Dkt. 67, Dkt. 68, and Dkt. 69, are DENIED.

3. Defendant Edwards' motion to supplement the record, Dkt. 118, is GRANTED.

Entered January 21, 2020.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge